Appeal of BRYANT & STRATTON             Docket No. 43.
COMMERCIAL SCHOOL, INC.

> The taxpayer was a personal service corporation within section 200 of the Revenue Act of 1918.

Submitted September 30, 1924; decided October 29, 1924.

*Philip Nichols, Esq.*, for the taxpayer.

*Arthur H. Deibert, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before JAMES, STERNHAGEN, TRAMMELL, and TRUSSELL.

This appeal comes to the Board upon a petition and answer raising questions of fact. Oral hearing was had at which witnesses testified in behalf of both parties. Oral argument was made by counsel and briefs have been filed. The deficiency asserted covers the three fiscal years ending June 30, 1919, 1920, and 1921, aggregating $40,537.69, all of which depends upon the single question whether the taxpayer was, during the period in question, a personal service corporation as defined in section 200 of the Revenue Act of 1918, as follows:

The term "personal service corporation" means a corporation whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing factor; * * *.

### FINDINGS OF FACT.

The Bryant & Stratton Commercial School, Inc., is a Massachusetts corporation doing business at 334 Boylston Street, Boston, Mass. It was incorporated in 1917 to succeed the Bryant & Stratton School, well known throughout New England, which had been in existence since 1865 and was since 1868 owned and conducted by Hermon E. Hibbard. From the time of its incorporation and throughout the period here in question, the capital stock of the corporation consisted of 700 shares of common stock, owned as follows:

|                              | Shares. |
| ---------------------------- | ------- |
| J. William Blaisdell         | 350     |
| Minerva H. Blaisdell (his wife) | 50   |
| Llewellyn O. White           | 250     |
| Lilla M. White (his wife)    | 50      |

Blaisdell was president and White vice president, treasurer, and secretary of the corporation. The capital was $70,000, all of which was originally paid in, of which $30,000 represented the cost of tangible property and $40,000 the cost of good will. This tangible property consisted of furniture and fixtures, such as desks, chairs, and blackboards, and typewriters, stationery, and other miscellaneous supplies.

The principal stockholders, Blaisdell and White, had been in the employ of the school since 1887 and 1895, respectively, and had occupied various positions and performed various functions. For a considerable time prior to the organization of the corporation, and especially during Hibbard's frequent absences, they had virtually been in charge of the school and had been responsible for its management and success. The standing and reputation of the school were to a substantial degree attributable to them.

During the years in question they were in full and complete control. Blaisdell was principal and White secretary. They laid out all of the courses of instruction, consisting of shorthand, typewriting, bookkeeping, civil service, secretarial service, general business, and teaching in commercial schools. They supervised all of this instruction and to some extent actually gave instruction. They devoted themselves exclusively to the conduct of the school and were in constant attendance at their offices. Blaisdell, who appeared as a witness in the appeal, testified that he was very frequently in personal touch with the students, who came to him for advice as to their particular studies and their courses. Although White devoted himself more largely to the administrative details of the business aspects of the school, such as the keeping and supervision of the accounts, he also was to a substantial degree engaged in educational activities.

The taxpayer leased and occupied 4 floors of a building on Boylston Street, with more than 20 classrooms. All of these classrooms were equipped with the usual school equipment. About 200 typewriters were owned, some of which were rented to the pupils for home use. This rental was, however, confined strictly to pupils and to the extent that it was incidentally necessary to their proper instruction. Stationery and supplies were also sold to the pupils, but only to the extent necessary to their convenient instruction. The receipts from such sales were at a slight advance over cost so as to cover maintenance of the department.

The school had about 27 to 30 subordinate teachers receiving an aggregate amount of salaries of $60,091.56 in 1919, $54,002.61 in 1920, and $58,302.88 in 1921. None of these participated in the management or was in control or charge of any course or group of subjects. Such courses were directly under the control and supervision of Blaisdell and White.

One of the features of the school was its employment department, the function of which was to assure to its graduates satisfactory positions. This received a substantial portion of the personal attention of Blaisdell. There were two sides to this work. Not only did he interview the students for the purpose of securing for them suitable employment, but he also kept in touch with prospective employers so as to assure such positions.

The following are the gross receipts:

|  | 1919 | 1920 | 1921 |
|---|---|---|---|
| Tuition | $140,147.12 | $160,112.67 | $180,668.74 |
| Sale of stationery and supplies | 3,846.45 | 5,715.75 | 5,223.17 |
| Rent of typewriters | 5,117.61 | 3,083.06 | 2,779.59 |
| Profit on machines sold |  |  | 2,317.50 |
| Miscellaneous | 2,978.68 | 4,271.20 | 908.55 |
| Total | 152,089.86 | 173,182.68 | 191,897.55 |

The accounts receivable appearing on the balance sheet were made up as follows:

|  | 1919 | 1920 | 1921 |
|---|---|---|---|
| L. O. White overdraft | $3,321.89 |  |  |
| Typewriter rentals | 2,206.34 | $1,415.34 | $2,316.01 |
| Typewriter exchange | 6,634.85 | 6,224.41 | 5,846.69 |
| Total | 12,163.08 | 7,639.75 | 8,162.70 |

The item of typewriter rentals represents the amounts due from students for rental of typewriters in their possession at the end of the fiscal year. The item of typewriter exchange represents the value of typewriters and is in reality an item of tangible assets and not an account receivable. As a general rule payments for tuition were cash transactions and not on credit. Diplomas were withheld until payment was made. Although in some instances students were behind in payment, this was for not more than a few weeks. Promissory notes were never taken.

The capital of the corporation was found by the Commissioner to be, 1919, $77,608.16; 1920, $74,112.50; 1921, $60,893.10, and the so-called taxable income, 1919, $30,267.51; 1920, $33,140.49; 1921, $48,-916.66. The corporation spent for advertising, 1919, $12,448.92; 1920, $16,497.86; 1921, $16,798.50.

In its original return for the fiscal period ended June 30, 1918, the taxpayer made no claim for recognition as a personal service corporation but paid income and profits taxes of $4,081.64. At the time of filing this return the Revenue Act of 1918 had not been passed, and the definition of personal service corporation contained in that Act was unknown. On May 12, 1919, the taxpayer filed a claim for refund of the total tax paid, on the ground that it was a personal service corporation within the meaning of the Act. While this claim was pending, the returns for the years in question were filed, in which the taxpayer claimed to be a personal service corporation and paid no tax. On June 27, 1922, by letter from the Commissioner to the taxpayer, the claim for classification as a personal service corporation was allowed in the following language, and the 1918 tax refunded:

After careful consideration of the facts submitted, your claim for classification as a personal service corporation, under the provisions of section 200 of the Revenue Act of 1918, and exemption from taxation as such under the provisions of section 218(e) has been allowed.

During the years in question Blaisdell and White in their individual returns included their respective shares of the corporate income in the belief that the corporation was properly a personal service corporation.

No examination of the corporation's books or business was made at the school and no representative of the Bureau of Internal Revenue visited the school for any purpose until February, 1924, when a field investigation and examination of the books and records was made by William J. McCarthy, a revenue agent. McCarthy was given free access to all of the books and papers and the entire premises were available for his inspection and investigation. He worked for about a week in a room adjoining that of Blaisdell and observed the conduct of the school generally. He heard much of the conversation which took place in Blaisdell's office, and under date of March 1, 1924, he made the following report to the internal revenue agent in charge:

In re: Bryant & Stratton School, Inc., 334 Boylston Street, Boston, Mass.

BOSTON, MASS., *March 1, 1924.*

Examining officer, Wm. J. McCarthy.
Examination commenced, February 25, 1924.
Examination completed, March 1, 1924.
Days spent on examination, 4.

INTERNAL REVENUE AGENT IN CHARGE,
*Boston, Mass.*

An examination of the books and records of the above-named personal service corporation for the fiscal years ended June 30, 1919, June 30, 1920, and June 30, 1921, disclosed the information which is made a part of this report.

Kind of business_____Commercial school.

Authority for examination: In connection with the examination of the individual returns of J. Wm. Blaisdell, 129 Arlington Street, Newton, Mass., who is a shareholder of this corporation.

Examination disclosed no basis for consolidation.

### HISTORY OF ORGANIZATION.

The Bryant & Stratton Commercial School, Inc., was organized under date of July 10, 1917, under the laws of the State of Massachusetts, with an authorized capital stock of $75,000, comprising 750 shares of common stock, par value $100 per share, and no preferred stock. There was issued $70,000 of common stock for cash.

### IMPORTANT FEATURES.

The Bryant & Stratton Commercial School has been established for several years, and up to the time of the incorporation in 1917 it was owned by a single individual, who conducted the school as an individual business. Soon after this individual's death, in 1917, the furniture and fixtures, merchandise, and good will of the Bryant & Stratton Commercial School was sold to the Bryant & Stratton Commercial School, Inc., for cash.

The shareholders of the Bryant & Stratton Commercial School, Inc., are as follows:

| | |
|---|---|
| J. Wm. Blaisdell | 350 |
| Minerva H. Blaisdell | 50 |
| Llewellyn O. White | 250 |
| Lilla M. White | 50 |
| Total | 700 |

J. Wm. Blaisdell, owning 350 shares, or one-half interest, is the principal of the school. He has been connected with the school for about a period of 30 years and for a number of years has acted in the same capacity.

Llewellyn O. White, owning 250 shares, or $\frac{5}{4}$ interest, is the vice president, treasurer, and secretary and assistant to Mr. Blaisdell. He has been connected with the school for a period of about 25 years.

The corporation has both home study and resident instruction departments but does not lodge or board its students.

The corporation does not take any notes from the students or is any business solicited.

It will be noted that the corporation paid $40,000 in cash for the "good will" of the Bryant & Stratton Commerical School. It was stated by Mr. L. O. White that at the time the school was up for sale an offer was made by another party, who agreed to pay $40,000 for the "good will" providing that Mr. Blaisdell and Mr. White agreed to sign contracts to give their services to the school in the same manner as they had always done. Upon their refusal to make such contracts, no offer was made, because it was seen that without the services of these two men the "good will" would have no value in two years' time after it became known that they had left the school.

The principal owners, Mr. Blaisdell and Mr. White, give all their time and attention to the preparation of courses, syllabus of work, inspection of higher lessons, and settlement of points in dispute. They also spend considerable time in giving individual instruction to the students by having them come to their office and take up with them any studies which the students do not clearly understand. The school is conducted wholly on a personal service basis, as the principal part of its net income is due to the services, ability, reputation, and standing of the principals.

The income from the sale of school books and supplies and rent of typewriters is incidental to the income received from tuitions.

School books and supplies are sold only to students attending the school and the profit received is very small, as it is not the intention that a profit should be made, the books being sold for an amount sufficient enough to cover expenses of handling same.

Stationery and supplies are kept only for the convenience of the students, so that if such is needed by them it can be purchased at the school, without having the students going out to an outside store to purchase stationery during school hours.

In considering the basis of a personal service corporation the examining officer has referred to Cumulative Bulletin 2, page 16 (Com. Rec. 24) and Cumulative Bulletin 5, page 20 (Com. Rec. 683).

The various items were discussed with Mr. Blaisdell and Mr. White, the principals of the school, and they were advised of the findings.

The Board finds that the income of the taxpayer during the period in question was attributable primarily to the activities of Blaisdell and White, who were the principal stockholders; that Blaisdell and White were regularly engaged in the active conduct of the affairs of the corporation; and that capital was not a material income-producing factor.

#### DECISION.

The taxpayer was during the fiscal years ending June 30, 1919, 1920, and 1921, a personal service corporation, and the deficiency determined by the Commissioner in the sum of $40,537.69 for the said years is disallowed.

#### OPINION.

STERNHAGEN: The statutory definition of a personal service corporation contains three elements, all of which must be present. First, the income must be ascribed primarily to the activities of the principal stockholder; second, such principal owners or stockholders must be regularly engaged in the active conduct of the corporation's affairs; and, third, the income of the corporation may not be materially produced by capital. It will be noted that each of these three

elements is so qualified as to require careful individual judgment in every case. The first element requires not that the income must be ascribable entirely to the activities of the stockholders, but only that it shall be *primarily* so. In the second element the stockholders are not merely to be somewhat engaged in the corporation's affairs, but they must be *regularly* and *actively* engaged in such affairs. And in the third element, if any capital is employed in the business, it may not be a *material* income-producing factor. These qualifying words, *primarily*, *regularly* and *actively*, and *material*, preclude any definitive classification. They make necessary the application of a flexible judgment, and since we are required by the statute to decide the question, it is our judgment which must be applied to the facts of each case which comes before us. No intensive rule can be laid down, and it is not surprising that the Commissioner's administration of this section of the statute has been an extremely difficult task. The very statement of a rule, if rigidly adhered to, would defeat the letter and intendment of the Act.

Here we have an incorporated commercial school to consider. We are not called upon to decide whether all schools are within the definition, or even whether all commercial schools are so. The Commissioner has well said in A. R. R. 24 (C. B. 2, 16) that "education and instruction are primarily and before all personal service and should be so classified unless there are cogent reasons for a different classification." But, however true this general statement may be, it does not follow that all corporations having to do with education and instruction are within the statutory classification. And this is a corporation which the Commissioner has said is on the other side of the line. We do not think so. We are of the opinion that all of the facts before us taken together constitute a personal service corporation.

Blaisdell and White are the guiding spirits in the school. Nothing takes place without their personal knowledge and supervision. For years before Hibbard's death, Blaisdell had often and for long periods been in charge. So important is their function that when upon the death of Hibbard in 1917 the school was for sale the only offer which was received was expressly based upon the condition that Blaisdell and White should remain to conduct its affairs. When they refused the offer was withdrawn. That they are regularly engaged in the active conduct of the school is beyond question, and we think this is the primary factor in the success of the enterprise. Blaisdell, who although an interested witness was nevertheless a man whose statements are entitled to respect, stated that he felt sure that had they organized another school, the taxpayer corporation would have lasted only two years. We may perhaps take this statement with some reservation, but we nevertheless think from the evidence that the taxpayer would have been in a very serious situation if Blaisdell and White had quit. The fact that many teachers are employed to give instruction, while it shows that the income is not attributable solely to the activities of stockholders, does not prove that the stockholders are not the primary source of income.

We come then to the third necessary element—that capital is not a material income-producing factor. It is urged that since $70,000

was originally invested in the corporation at the time of the purchase of the school in 1917, $40,000 of which was invested in good will, this makes the definition inapplicable. Furthermore, it is said that substantial amounts spent annually for advertising and salaries show that capital was a material income-producing factor. But it is not the existence of capital which is determinative. If it were so, the statute would be fruitless. For all business corporations have capital. It is only when capital is important in the production of income that the definition does not apply. The common case of the manufacturing corporation receiving its income from the sale of goods produced by its plant is clearly outside the classification. But school desks and blackboards do not produce income except remotely. Nor did the so-called good will of the school. Apparently here the good will was a composite of the school's established name, its well-known location, and the reputation of Blaisdell and White. Of these, the last was clearly the most important; and thus we are brought again to the very personal aspect of the business. It is apparent that these men were absolutely essential to the success of the enterprise—so much so that their refusal to agree to continue to manage the school on salaries killed an offer for its purchase. The amounts expended annually for salaries and advertising are not capital. They are current expenses, and it is not to be assumed that in an income tax law Congress so loosely used the word capital as to confuse it in this definition with expense. This is especially clear in view of the parenthetical expression "whether invested or borrowed," which can hardly be assumed to refer to amounts paid for current salaries and advertising.

We conclude that the taxpayer was a personal service corporation during the period in question and was therefore not liable for the tax now asserted. The deficiency is disallowed.